**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 12-2340

FEDERAL TRADE COMMISSION,

Plaintiff - Appellee,

v.

KRISTY ROSS, individually and as officer of Innovative
Marketing, Inc.,

Defendant – Appellant,

and

INNOVATIVE MARKETING, INC., d/b/a Winsolutions FZ-LLC, d/b/a
Billingnow, d/b/a Winpayment Consultancy SPC, d/b/a
BillPlanet PTE Ltd., d/b/a Revenue Response Sunwell, d/b/a
Globedat, d/b/a Winsecure Solutions, d/b/a Synergy Software
BV, d/b/a Innovative Marketing Ukraine; BYTEHOSTING INTERNET
SERVICES, LLC; JAMES RENO, d/b/a Setupahost.net,
individually, and as an officer of ByteHosting Internet
Services, LLC; SAM JAIN, individually and as an officer of
Innovative Marketing, Inc.; DANIEL SUNDIN, d/b/a Vantage
Software, d/b/a Winsoftware, Ltd., individually and as an
officer of Innovative Marketing, Inc.; MARC D'SOUZA, d/b/a
Web Integrated Net Solutions, individually and as an officer
of Innovative Marketing, Inc.; MAURICE D'SOUZA,

Defendants.

Appeal from the United States District Court for the District of
Maryland, at Baltimore.   Richard D. Bennett, District Judge.
(1:08-cv-03233-RDB)

Argued:  October 31, 2013          Decided:  February 25, 2014

Before DAVIS and FLOYD, Circuit Judges, and HAMILTON, Senior Circuit Judge.

———————

Affirmed by published opinion.  Judge Davis wrote the opinion, in which Judge Floyd and Senior Judge Hamilton joined.

———————

**ARGUED:** Robert P. Greenspoon, FLACHSBART & GREENSPOON, LLC, Chicago, Illinois, for Appellant.  Theodore Metzler, FEDERAL TRADE COMMISSION, Washington, D.C., for Appellee.  **ON BRIEF:** William W. Flachsbart, FLACHSBART & GREENSPOON, LLC, Chicago, Illinois, for Appellant.  David C. Shonka, Acting General Counsel, John F. Daly, Deputy General Counsel, FEDERAL TRADE COMMISSION, Washington, D.C., for Appellee.

———————

DAVIS, Circuit Judge:

The Federal Trade Commission sued Kristy Ross in U.S. District Court for the District of Maryland for engaging in deceptive internet advertising practices. After a bench trial, the district court entered judgment enjoining Ross from participating in the deceptive practices and holding her jointly and severally liable for equitable monetary consumer redress in the amount of $163,167,539.95. F.T.C. v. Ross, 897 F. Supp. 2d 369, 388-89 (D. Md. 2012). On appeal, Ross challenges the district court's judgment on several bases: (1) the court's authority to award consumer redress; (2) the legal standard the court applied in finding individual liability under the Federal Trade Commission Act; (3) the court's prejudicial evidentiary rulings; and finally, (4) the soundness of the district court's factual findings. For the reasons set forth within, we affirm.

I

The Commission sued Innovative Marketing, Inc. ("IMI"), and several of its high-level executives and founders, including Ross, for running a deceptive internet "scareware" scheme in violation of the prohibition on deceptive advertising in Section 5(a) of the Federal Trade Commission Act, 15 U.S.C. § 45(a). The core of the Commission's case was that the defendants operated "a massive, Internet-based scheme that trick[ed] consumers into purchasing computer security software," referred to as

3

"scareware." J.A. 29. The advertisements would advise consumers that a scan of their computers had been performed that had detected a variety of dangerous files, like viruses, spyware, and "illegal" pornography; in reality, no scans were ever conducted. J.A. 29.

Ross, a Vice President at IMI, hired counsel and defended against the suit; the remaining defendants either settled or had default judgment entered against them.

The district court entered summary judgment in favor of the Commission on the issue of whether the advertising was deceptive, but it set for trial the issue of whether Ross could be held individually liable under the Federal Trade Commission Act, i.e., whether Ross "was a 'control person' at the company, and to what extent she had authority for, and knowledge of the deceptive acts committed by the company." J.A. 925.

After a bench trial, the district court found in favor of the Commission. Specifically, it found that Ross'

> broad responsibilities at IMI coupled with the fact that she personally financed corporate expenses, oversaw a large amount of employees and had a hand in the creation and dissemination of the deceptive ads prove[d] by a preponderance of the evidence that she had authority to control and directly participated in the deceptive acts within the meaning of Section 5 of the [Federal Trade Commission] Act.

Ross, 897 F. Supp. 2d at 384. The district court further concluded that Ross had actual knowledge of the deceptive marketing scheme, or was "at the very least recklessly

indifferent or intentionally avoided the truth" about the scheme. Id. at 386. It entered judgment against Ross in the amount of $163,167,539.95, and it enjoined her from engaging in similar deceptive marketing practices. Id. at 389. Ross timely appealed.

## II

The Federal Trade Commission Act authorizes the Commission to sue in federal district court so that "in proper cases the Commission may seek, and after proper proof, the court may issue, a permanent injunction." 15 U.S.C. § 53(b). Ross contends that the district court did not have the authority to award consumer redress – a money judgment - under this provision of the statute.

Ross first takes the position, correctly, that the statute's text does not expressly authorize the award of consumer redress, but precedent dictates otherwise: the Supreme Court has long held that Congress' invocation of the federal district court's equitable jurisdiction brings with it the full "power to decide all relevant matters in dispute and to award complete relief even though the decree includes that which might be conferred by a court of law." Porter v. Warner Holding Co., 328 U.S. 395, 399 (1946). Once invoked by Congress in one of its duly enacted statutes, the district court's inherent equitable powers cannot be "denied or limited in the absence of a clear

5

and valid legislative command." Id. Porter and its progeny thus articulate an interpretive principle that inserts a presumption into what would otherwise be the standard exercise of statutory construction: we presume that Congress, in statutorily authorizing the exercise of the district court's injunctive power, "acted cognizant of the historic power of equity to provide complete relief in light of statutory purposes." Mitchell v. Robert DeMario Jewelry, Inc., 361 U.S. 288, 291–92 (1960).

Applying this principle to the present case illuminates the legislative branch's real intent. That is, by authorizing the district court to issue a permanent injunction in the Federal Trade Commission Act, 15 U.S.C. § 53(b)(2), Congress presumably authorized the district court to exercise the full measure of its equitable jurisdiction. Accordingly, absent some countervailing indication sufficient to rebut the presumption, the court had sufficient statutory power to award "complete relief," including monetary consumer redress, which is a form of equitable relief. Porter, 328 U.S. at 399.

Ross insists that the text of the Federal Trade Commission Act is unlike that of the statutes at issue in Porter and Mitchell, and therefore argues that the interpretive principle of those cases is inapplicable in her case. In Porter, a case involving the Emergency Price Control Act of 1942, the statute

6

authorized district courts to grant "a permanent or temporary injunction, restraining order, or other order." 328 U.S. at 397 (internal quotations and citation omitted). Ross contends that the "other order" language, absent from the instant provision of the Federal Trade Commission Act, cabins Porter's applicability. See also United States v. Phillip Morris USA, Inc., 396 F.3d 1190, 1198 (D.C. Cir. 2005). In other words, her argument is that Porter was a "magic words" case – if Congress uses the magic words "other order," then Congress has invoked the full injunctive powers of the district court.

Ross' magic words argument fails because it ignores how the Supreme Court subsequently untethered its reasoning from the "other order" language of the Emergency Price Control Act and significantly expanded Porter's holding. The language of the statute at issue in Mitchell, the Fair Labor Standards Act, was different from the language of the statute in Porter, providing only that the district court had jurisdiction to "restrain violations of Section 15." Mitchell, 361 U.S. at 289 (internal quotation and citation omitted). Notwithstanding the silence of the Fair Labor Standards Act as to the district court's express power to award reimbursement of lost wages and the absence of the "other order" language, the Court held that ordering reimbursement was nevertheless permissible under the holding of Porter. 361 U.S. at 296. In comparing the language of the Fair

7

Labor Standards Act with the Emergency Price Control Act, the Mitchell Court reasoned that the "other order" provision was merely an "affirmative confirmation" — icing on the cake — over and above the district court's inherent equitable powers. See id. at 291.

The point is that Mitchell broadened Porter's applicability, rendering the textual statutory differences irrelevant to the ultimate conclusion: because there is no affirmative and clear legislative restriction on the equitable powers of the district court, ordering monetary consumer redress is an appropriate "equitable adjunct" to the district court's injunctive power. Porter, 328 U.S. at 399.

Ross makes a series of arguments about how the structure, history, and purpose of the Federal Trade Commission Act weigh against the conclusion that district courts have the authority to award consumer redress; her arguments are not entirely unpersuasive, but they have ultimately been rejected by every other federal appellate court that has considered this issue. F.T.C. v. Bronson Partners LLC, 654 F.3d 359, 365-67 (2d Cir. 2011); F.T.C. v. Amy Travel Service, Inc., 875 F.2d 564, 571 (7th Cir. 1989); F.T.C. v. Security Rare Coin & Buillion Corp., 931 F.2d 1312, 1314-15 (8th Cir. 1991); F.T.C. v. Pantron I Corp., 33 F.3d 1088, 1101-02 (9th Cir. 1994); F.T.C. v. Gem Merchandising Corp., 87 F.3d 466, 468-70 (11th Cir. 1996). We

8

adopt the reasoning of those courts and reject Ross' attempt to obliterate a significant part of the Commission's remedial arsenal. A ruling in favor of Ross would forsake almost thirty years of federal appellate decisions and create a circuit split, a result that we will not countenance in the face of powerful Supreme Court authority pointing in the other direction.

## III

The Federal Trade Commission Act makes it unlawful for any person, partnership, or corporation "to disseminate, or cause to be disseminated, any false advertisement" in commerce, 15 U.S.C. § 52(a), and it authorizes the Commission to bring suit in federal district court when it finds that any such person, partnership, or corporation "is engaged in, or is about to engage in, the dissemination or the causing of the dissemination of any" false advertisement, 15 U.S.C. § 53(a)(1).

The district court ruled that one could be held individually liable under the Federal Trade Commission Act if the Commission proves that the individual (1) participated directly in the deceptive practices or had authority to control them, and (2) had knowledge of the deceptive conduct, which could be satisfied by showing evidence of actual knowledge, reckless indifference to the truth, or an awareness of a high probability of fraud combined with intentionally avoiding the truth (i.e., willful blindness). Ross, 897 F. Supp. 2d at 381.

9

Ross contends that the district court's standard was wrong and asks us to reject it. She proposes that we import a standard from our securities fraud jurisprudence that requires proof of an individual's (1) "authority to control the specific practices alleged to be deceptive," coupled with a (2) "failure to act within such control authority while aware of apparent fraud." App. Br. 35 (citing Dellastatious v. Williams, 242 F.3d 191, 194 (4th Cir. 2001)). Any other standard, argues Ross, would permit a finding of individual liability based on "indicia having more to do with enthusiasm for and skill at one's job [rather] than authority over specific ad campaigns, and allow fault to be shown without any actual awareness of" a co-worker's misdeeds. App. Br. 36. Ross maintains that she would not have been held individually liable under her proposed standard.

Ross' proposed standard would permit the Commission to pursue individuals only when they had actual awareness of specific deceptive practices and failed to act to stop the deception, i.e., a specific intent/subjective knowledge requirement; her proposal would effectively leave the Commission with the "futile gesture" of obtaining "an order directed to the lifeless entity of a corporation while exempting from its operation the living individuals who were responsible for the illegal practices" in the first place. Pati-Port, Inc. v. F.T.C., 313 F.2d 103, 105 (4th Cir. 1963).

10

We hold that one may be found individually liable under the Federal Trade Commission Act if she (1) participated directly in the deceptive practices or had authority to control those practices, and (2) had or should have had knowledge of the deceptive practices. The second prong of the analysis may be established by showing that the individual had actual knowledge of the deceptive conduct, was recklessly indifferent to its deceptiveness, or had an awareness of a high probability of deceptiveness and intentionally avoided learning the truth.

Our ruling maintains uniformity across the country and avoids a split in the federal appellate courts. Every other federal appellate court to resolve the issue has adopted the test we embrace today. F.T.C. v. Direct Marketing Concepts, Inc., 624 F.3d 1, 12 (1st Cir. 2010); Amy Travel Service, 875 F.2d at 573-74; F.T.C. v. Publishing Clearing House, Inc., 104 F.3d 1168, 1170 (9th Cir. 1997); F.T.C. v. Freecom Communications, Inc., 401 F.3d 1192, 1207 (10th Cir. 2005); Gem Merchandising Corp., 87 F.3d at 470. Ross' proposed standard, by contrast, invites us to ignore the law of every other sister court that has considered the issue, an invitation that we decline.

IV

Ross next mounts three evidentiary challenges. First, Ross contends that the district court improperly precluded her

11

expert, Scott Ellis, from testifying about how "the advertisements linkable to Ms. Ross's responsibilities were nondeceptive." App. Br. 29. As the district court correctly ruled, however, Ellis' testimony was irrelevant because it had already decided the deceptiveness issue in favor of the Commission at summary judgment. The only issue held over for trial was whether Ross had the requisite degree of control necessary to hold her individually liable for the company's deceptive practices, i.e., whether she participated directly in the company's deceptive practices or had authority to control those practices and had or should have had knowledge of those practices. Because the individual liability standard does not require a specific link from Ross to particular deceptive advertisements and instead looks at whether she had authority to control the corporate entity's practices, Ellis' testimony was immaterial, and thus irrelevant, to the issue reserved for trial. Fed. R. Evid. 401.

Second, Ross challenges the admission of a 2004 to 2006 profit and loss statement that the district court relied on to calculate the amount of consumer redress. The documents were produced during discovery in corporate litigation involving some of Ross' co-defendants in Canada. Daniel Sundin and Sam Jain sued Marc D'Souza, all of whom were co-defendants of Ross in this case and executives at IMI. Jain submitted an affidavit

12

along with a profit and loss summary for the company for the period of 2004 to 2006; the documents were "litigation-purpose financial summaries [of IMI's profits] described in [Jain's] affidavit as a Quickbooks printout." App. Br. 31, J.A. 1790, 1799.

Although the district court admitted the profit and loss statement under Federal Rule of Evidence 807, the residual exception to the rule against hearsay, F.T.C. v. Ross, 2012 WL 4018037, at *1-3 (D. Md. Sept. 11, 2012), we may affirm the district court "on the basis of any ground supported by the record even if it is not the basis relied upon by the district court," Ostrzenski v. Seigel, 177 F.3d 245, 253 (4th Cir. 1999), and we conclude that the profit and loss summary plainly was admissible as an adoptive admission by Ross. Fed. R. Evid. 801(d)(2)(B). Ross expressly adopted Jain's affidavit: she swore in her own affidavit produced during the Canadian litigation that she had read Jain's affidavit and was "in agreement with [its] contents." J.A. 1590. She did take some exceptions, but she did not object to the profit and loss statement attached to Jain's affidavit, nor did she object to the authenticity or reliability of the statements.

The third of Ross' evidentiary assignments of error also rests on the improper admission of hearsay evidence: an e-mail from Sundin to Jettis, a payment processor, listing Skype

13

numbers and titles for a group of high-level company executives. Ross' telephone number is listed on the e-mail, as is her title, "Vice President." The district court admitted the e-mail pursuant to the hearsay exception for statements made by a co-conspirator in furtherance of the conspiracy. Fed. R. Evid. 801(d)(2)(E). Ross argues that there was insufficient evidence establishing as a predicate for the e-mail's admission the existence of the conspiracy, and that admission of the e-mail itself was improper "bootstrapping" of the existence of the conspiracy to the document's admissibility. See Bourjaily v. United States, 483 U.S. 171, 176-81 (1987).

We disagree. It is true, of course, that the proponent for admission of a co-conspirator's out-of-court statement "must demonstrate the existence of the conspiracy by evidence extrinsic to the hearsay statements." United States v. Stroupe, 538 F.2d 1063, 1065 (4th Cir. 1976). But that requirement was satisfied in this case. There was independent evidence that established the existence of the conspiracy: Ross produced an affidavit during the corporate litigation in Canada in which she stated that she was a Vice President and one of the founders of IMI, and she adopted the affidavits of her co-defendants attesting to the same facts. The affidavits provided a sufficient basis upon which the district court could conclude, prima facie, see United States v. Vaught, 485 F.2d 320, 323 (4th

14

Cir. 1973), the existence of a conspiracy. Moreover, the e-mail from Sundin to Jettis was a quintessential example of a statement made "in furtherance" of the conspiracy because its role was to maintain the logistics of the conspiracy and "identify names and roles" of members of the deceptive advertising endeavor. Michael H. Graham, Handbook of Federal Evidence 421 (7th ed. 2013).

In sum, we find no reversible error in the district court's evidentiary rulings that are challenged on appeal by Ross.

V

Ross' last contention is that the district court clearly erred in finding that she had "control" of the company, participated in any deceptive acts, and had knowledge of the deceptive advertisements. In a bench trial, we review the district court's factual findings for clear error and its legal conclusions de novo. Fed. R. Civ. P. 52; Helton v. AT&T, Inc., 709 F.3d 343, 351 (4th Cir. 2013). "In cases in which a district court's factual findings turn on assessments of witness credibility or the weighing of conflicting evidence during a bench trial, such findings are entitled to even greater deference." Helton, 709 F.3d at 351.

The district court did not clearly err in finding that Ross had "authority to control the deceptive acts within the meaning" of the Federal Trade Commission Act. Ross, 897 F. Supp. 2d at

15

383. In an affidavit in the Canadian litigation, she swore that she was a high-level business official with duties involving, among other things, "product optimization," which the district court could reasonably have inferred afforded her authority and control over the nature and quality of the advertisements. J.A. 1589. Moreover, there was evidence that other employees requested Ross' authority to approve certain advertisements, and that she would check the design of the advertisements before approving them.

Nor did the district court clearly err in finding that Ross "directly participated in the deceptive marketing scheme." Ross, 897 F. Supp. 2d at 384. Ross' statements to other employees, as memorialized in chat logs between her and other employees were evidence that she served in a managerial role, directing the design of particular advertisements. J.A. 3580 ("anyway we have to get all this advertisement stuff off these ads can you please [make] sure it happens it needs to happen for all domains"); J.A. 1491 ("btw we have some 30 creatives for errclean [sic] not just 2-3 just add aggression tot hem [sic]"). Ross was a contact person for the purchase of advertising space for IMI, and there was evidence that Ross had the authority to discipline staff and developers when the work did not meet her standards. J.A. 1466 ("please ensure its [sic] going to be done or im [sic] going to fine the department and MCs for not finishing it"). Given these

16

facts, the district court could have reasonably inferred that Ross was actively and directly participating in multiple stages of the deceptive advertising scheme – she played a role in design, directed others to "add aggression" to certain advertisements, was in a position of authority, had the power to discipline entire departments, and purchased substantial advertising space.

The district court did not clearly err in finding that Ross "had actual knowledge of the deceptive marketing scheme" and/or that she was "at the very least recklessly indifferent or intentionally avoided the truth." Ross, 897 F. Supp. 2d at 386. There was evidence that she edited and reviewed the content of multiple advertisements. At one point, she ordered the removal of the word "advertisement" from a set of ads. J.A. 3580. Co-defendant Sundin, the Chief Technology Officer of IMI and its sole shareholder and director, attested that Ross assumed some of his duties during his long-term illness. And although there was some indication that Ross acted in a manner suggesting that she personally did not perceive (or believe) that the advertisements were deceptive, Ross was on notice of multiple complaints about IMI's advertisements, including that they would cause consumers to automatically download unwanted IMI products.

All of this evidence paints a picture that the district court was wholly capable of accepting as a matter of fact: Ross

17

made "countless decisions" that demonstrated her authority to control IMI. F.T.C. v. Bay Area Business Council, Inc., 423 F.3d 627, 637 (7th Cir. 2005). Although a different fact-finder may have come to a contrary conclusion from that reached by the experienced district judge in this case, the "rigorous" clear error standard requires more than a party's simple disagreement with the court's findings. PCS Nitrogen, Inc. v. Ashley II of Charleston, LLC, 714 F.3d 161, 174-75 (4th Cir. 2013).

## VI

The judgment of the district court is

AFFIRMED.